WITTER vs. LYON and others, impleaded, etc.

PROCEEDINGS FOR CONTEMPT. (1) *Order discharging order to show cause, etc., appealable.* (2) *Practice in proceedings for contempt.* (3) *When party will be adjudged in contempt.* (4) *Case stated.*

1. An order discharging a former order by which a party was required to show cause why he should not be punished as for a contempt, is "a final order affecting a substantial right, made in a special proceeding," and as such is *appealable* under Tay. Stats., 1635, § 11.

    [LYON, J., regards the proceeding for a contempt as in the nature of a "provisional remedy," and the order as appealable under that clause of § 11 which relates to orders granting, refusing, etc., a provisional remedy.]

2. An order to show cause why a party should not be punished for a contempt, obtained on *ex parte* affidavits and other proofs, may be discharged on evidence of the same kind produced by the party against whom such order was granted; or the court may allow written interrogatories to be filed by the party moving for such order, and require specific answers to be made thereto under oath.

3. In general a party to a suit will not be adjudged in contempt therein for any act or omission which occurred before the suit was commenced, or before service of the process alleged to have been disregarded.

4. Plaintiffs obtained an injunction restraining defendants from removing certain bonds beyond the jurisdiction of the court, and requiring them to deposit such bonds with the treasurer of this state. Afterwards they procured an order upon defendants to show cause why they should not be punished for a contempt in disobeying such injunction; and defendants answered that the bonds had been removed and deposited in Chicago before any process was served upon them in the action, and that it was impossible for them to acquire possession or control of the bonds so as to comply with the mandate of the court. *Held*, that the court did not err in discharging the order upon this answer and affidavits filed in support thereof.

APPEAL from the Circuit Court for *Wood* County.

Chapter 210, P. & L. Laws of 1870, provided that the proper officers of Wood county might issue the bonds of that county, on certain conditions, for the purpose of aiding in the construction of a certain railroad into the city of Grand Rapids or village of Centralia; appointed the respondents in this action commissioners, to be known as the board of railroad commissioners of Wood county; made it their duty to take charge of the fund to be created; provided that a majority should constitute a quorum; and empowered them to make their own rules of government, elect a president and secretary, and generally do such things as might be authorized by the act. It further authorized them to form a contract with such railroad company, providing that said county should issue and deliver to said company its bonds, in exchange for an equal amount of capital stock of said company, under certain conditions named in the act; which contract was to contain the terms, etc., on which the railroad should be built, and was to be signed by the officers of the board and of the company, and to be filed forthwith in the office of the clerk of the board of supervisors of said county.

Provision was also made for the holding of an election by

the voters of Wood county to determine whether such bonds should be issued, for the issuing of bonds in case the election should be favorable to their issue, and for the levying of a tax; and the manner in which the bonds were to be executed was prescribed.

*Wood* and *Lyon*, two of the persons so appointed commissioners, became respectively president and secretary of said board; *Lyon* and four other members of the board became stockholders in the Wisconsin Valley Railroad; and *Powers*, one of the members, became its president; *Powers* was also clerk, and *Lyon* chairman, of the board of supervisors of said county.

On the 13th of March, 1872, a contract was entered into pursuant to the act above mentioned, signed by *L. P. Powers* as president of the Wisconsin Valley Railroad Company, in behalf of the company, and by *Wood* and *Lyon*, president and secretary of the board of commissioners, in which the company agreed, in substance, to build and equip a certain line of railroad, and to complete the same by the 1st of October, 1872; and the county of Wood, by said commissioners, agreed, on certain conditions, to issue its bonds, to be delivered in exchange for an equal amount of certificates of stock in said company. On the execution of said bonds they were to be placed in the office of the treasurer of this state, subject to the control of the commissioners, to be delivered to the railroad company when its track should be graded, etc., and the cars running thereon to within one-half mile of the village of Centralia. It was further agreed that the railroad company should place certificates of stock in the state treasurer's office, to be delivered on the delivery of the bonds; and that in case the company failed to perform its agreement according to its terms, the other party might declare the same void.

The complaint, after alleging the facts above stated, further averred, in substance, that the interests of said commissioners as stockholders disqualified them from acting for or represent-

ing the county commissioners; that *Powers* could not represent both parties in the controversy; that *Lyon* and *Powers* were the executive officers of the county board, as well as railroad commissioners and stockholders in the company; that an election had been held and had resulted favorably to the scheme contained in the contract; that the bonds were signed by the officers so exercising triple functions, and were placed in the control of the commissioners, who still had them in their custody and control, but had not deposited them with the state treasurer; that the time for the company to perform its contract had expired; that the board of commissioners had wrongfully and fraudulently taken the bonds, or caused them to be taken, out of the state, beyond the jurisdiction of the court, and placed them in the hands of some person or persons in Chicago, with intent to evade any order, process or decree which might be made by the courts of this state to enforce the rights of the plaintiffs in reference thereto; that no consideration had been received for the bonds, and there was great danger that they would be put in circulation fraudulently, and come to the hands of *bona fide* purchasers, etc. Prayer, among other things, for an injunction, mandatory in its nature, against the "railroad commissioners by name," that they, or such of them as had the custody of the bonds, be required, within ten days, to deposit them with the state treasurer, and that they refrain from delivering the said bonds, or from allowing them to be put in circulation; and for general relief. On March 13, 1873, the circuit judge granted a preliminary injunction as prayed for, requiring the deposit to be made with the state treasurer within ten days after the service of the order. The injunction was served on all the board of commissioners except *Mr. Scott*, on the next day, and on him on the 22d of the same month. This order was not complied with; and on the 28th of July, 1873, an order was granted, upon the papers on file, and the affidavits of *J. D. Witter*, Chas. M. Webb and the state treasurer, requiring the commissioners to show cause

on the 11th of August, before the court, why they should not be attached and punished for contempt in disobeying the said injunction, in that, since its service upon them, they had kept the said bonds, etc., out of the state, and had not placed them in custody of the state treasurer, etc.

The affidavits above referred to were, in substance, as follows: (1.) That of the state treasurer shows that the bonds in question had not, up to the 9th of April, 1873, been delivered to, or deposited with him. (2.) That of *J. D. Witter*, one of the board and one of the defendants, tended to show that about the 24th of January, 1873, *Powers* and *Rablin* stated to the board of supervisors of Wood county, that the bonds were then in the hands of the commissioners; that at a meeting of the board of commissioners on the 4th of February, 1873, the said *Powers* presented a resolution, which was adopted, to the effect that the said bonds be deposited in the Union National Bank of Chicago, in escrow, to be delivered to the said railroad company whenever the road should be completed from Tomah to Centralia, *provided*, that in case the said road was not completed on or before July 1, 1873, said bonds should be returned to the board of commissioners for cancellation; and that *R. C. Lyon* be appointed agent to make the deposit; that at the time of introducing this resolution, *Powers* stated that he had understood that a suit had been commenced to restrain the delivery of the bonds, and that if they were left in this state they might be tied up for a long time, and the railroad company put to great trouble to obtain them, and that the resolution was introduced to have them placed out of the state, beyond the jurisdiction of our courts. (3.) The affidavit of Charles M. Webb stated, in substance, that he was attorney for certain of the defendants; that on the 23d of July, 1873, defendant *Lyon* (secretary of the board of commissioners), stated to him that the said resolution, and the minutes showing the adoption of the same, were all the proceedings of the said board relating to the issue, delivery or deposit of said bonds, and that the bonds

had been deposited with the Union National Bank by R. C. Worthington, and, as *Lyon* believed, the said bonds were still in the hands of the said bank; and that on the 25th of July, 1873, the county clerk of said county informed him that there was no record in his office relating to the issue, delivery or deposit of said bonds, and that no action relating to them had been taken by the board of supervisors.

At the hearing, affidavits were read on behalf of the commissioners. (1.) That of *Powers* stated, in substance, that on the 4th of February, 1873, the terms of the agreement between the Wisconsin Valley Railroad Company and the board of commissioners was extended until July 1, 1873, and that at that time, by mutual consent, the Union National Bank of Chicago was agreed upon as the custodian of said bonds, in lieu of Henry Bætz (state treasurer); that he was informed that they had been deposited in said bank about February 7, 1873, and were held there subject only to removal by the mutual consent of the said board of commissioners and James F. Joy, and the said railroad company by its board of directors, or by discharge of the conditions of said deposit; that since such deposit, he, as president, and the board of commissioners, had not had control of the bonds, and they could not take them from said custodian except by consent of the company and the said Joy, which had never been given; that said bonds were beyond the control of the defendants at the time of the service of the injunctional order; that at the time named in the affidavit of *J. D. Witter*, no suit had been commenced, and the injunction was not served until March 14, 1873; and that the railroad company completed its track and had cars running thereon prior to the expiration of the time limited by said extension, and in full compliance with the terms on which they were placed in escrow. (2.) The affidavit of R. C. Worthington stated, in substance, that he had deposited the bonds in said bank, on the terms stated in a certain receipt signed by the president of the bank. This receipt acknowledged the

deposit in escrow of $50,000 in bonds, to be held until the said railroad should be completed from Tomah to Centralia, provided this was done before July 1, 1873; and it further stated that in case the road was completed by that date, the bonds were to be delivered to James F. Joy, or such person as he should designate, but otherwise they were to be returned to said board of commissioners. (3.) The affidavit of *R. C. Lyon* states that in January, 1873, an arrangement was made by the mutual agreement of the said commissioners, the railroad company, and James F. Joy (the terms of which are substantially as set forth in the receipt above mentioned). The affidavit, in other respects, is like those of *Powers* and Worthington which have already been stated.

It further appeared that the summons, complaint and injunction were served on the president of the Union National Bank of Chicago, on March 27, 1873, with notice from plaintiff's attorneys not to deliver said bonds to any one except by authority of the said commissioners, and to them only for the purpose of depositing them with the state treasurer of Wisconsin.

After the hearing, it was ordered that the order to show cause be discharged, and that the application for attachment be denied, with costs. From this order plaintiff appealed.

*Gregory & Pinney,* for appellant:

The equity of the complaint is clear. *Whiting v. Sheboygan etc. R. R. Co.,* 25 Wis., 167, 169; *Brodhead v. Milwaukee,* 19 id., 632; *Peck v. School District,* 21 id., 516, 520. There is a cause of action well stated justifying the interference of a court of equity to set aside and cancel the bonds. *Pickett v. School District,* 25 Wis., 551; P. & L. Laws of 1870, ch. 210; art. IV., secs. 21, 22 and 23, const. of Wis.; *State ex rel. Keenan v. Supervisors,* 25 Wis., 339. The injunction proceeded upon the ground that, as matter both of fact and of law, the bonds were still under control of the board of commissioners,— a fact not

fairly denied.    The order of the court denying the attachment was erroneous.

I. As to the injunction: (1.) Whether the act appointing the defendants was void or valid, is immaterial.    In either case the plaintiff, on the facts stated, was entitled to have the bonds placed under the control of the court; and the order requiring that they should be placed in the state treasurer's office, was made on the theory that it was a discreet exercise of the power which a court of equity has in cases of emergency to appoint a receiver, *without notice*, of the subject matter of the litigation, to the end that it may be under the control of the court.    *People v. Norton*, 1 Paige, 17; 8 id., 372, 481.    (2.) A mandatory injunction is common, and it was competent for the court to restrain the commissioners from allowing the then existing state of things to continue, although they might have to take some active measures.    *Spencer v. Birmingham & Lond. R. R. Co.*, 8 Sim., 193; *Jessel v. Chaplin*, 37 Eng. L. & Eq., 472; 7 Beav., 127; 1 Coll. Ch., 507; Kerr on Inj., 230, 231; id., 533, 535 (marg. p.); *Corning v. Troy Iron & Nail Factory*, 40 N. Y., 191. These cases show that the injunction was valid, and the regularity of its issue, or the equities of the plaintiff's case, cannot be questioned in this proceeding; the defendants were bound to obey it.    *People ex rel. Davis v. Sturtevant*, 19 N. Y., 263; *People v. Spalding*, 2 Paige, 329; *Sullivan v. Judah*, 4 id., 446.

II. As to the practice: The New York practice is the same as ours.    The defendant can be brought into court by an attachment in the first instance; but the almost universal course is to grant an order to show cause, or give notice, and the practice in this case was correct.    Hoffman Prov. Rem., 379; *Matter of Smethurst*, 2 Sandf., 724; *Bennett v. James*, cited in 1 Hoffman Ch. Pr., 434, note 2; *McCredie v. Senior*, 4 Paige, 381; R. S., ch. 149, sec. 5.    On the return of the attachment, interrogatories are propounded; and upon the answers to these, the original affidavits, and subsequent proofs, the court determines

whether the defendant has been guilty.   R. S., ch. 149, sec. 19. And the court may award a reference.   *Cumming v. Waggoner,* 7 Paige, 603; *Mayor v. Conover,* 5 Abb. Pr., 244; *Watson v. Fitzsimmons,* 5 Duer, 629.

III. Probable cause for issuing the attachment was shown. The provisions of ch. 210, P. & L. Laws of 1870, are the measure of the authority of the board of commissioners; and by the terms of that act, the bonds could lawfully be delivered to the company *only in the event of its performance of the terms and conditions of the contract before entered into;* but the company made default in their contract, and the bonds remained in the custody of the commissioners.   It was a violation of duty, and a fraud upon the plaintiff and others, the tax payers of the county, to send the bonds beyond the reach of any process or decree of the court; and this occurred only about a month before the injunction was served.   The powers of the commissioners were at an end when the company made default, and no depositary could obtain any right to the bonds by virtue of any contract made by the commissioners.   The bank in Chicago held the bonds as the agent of the defendants, and owed no duty to any one else respecting them.   All the acts and agreements by means of which Joy could have acquired any rights in the bonds, were utterly void.   There is no pretense that the bonds had ever been sold, or that they were not in the hands of defendants' agent.   Nor is there any pretense that they ever made any effort to comply with the order.   They undoubtedly had a right to control the bonds up to the completion of the road, June 16, 1873, as appears from all the facts; and their affidavit to the contrary is a mere conclusion of law. The plaintiffs made a showing which gave them the right to search the consciences of the defendants by interrogatories founded on the facts already disclosed, and to have a reference, if necessary.

*G. L. Park,* with *Vilas & Bryant,* of counsel, for respondent: 1. The order was not appealable.   *State ex rel. Chappell v.*

*Giles*, 10 Wis., 101; *Western Union R. R. Co. v. Dickson*, 30 Wis., 389; *Vilas v. Burton*, 27 Vt., 56; *St. John v. West*, 4 How. Pr., 329; *Oatman v. Bond*, 15 Wis., 20; *Rahn v. Gunnison*, 12 id., 528; R. S., ch. 122, secs. 1–3; 2 Tay. Stats., 1417. 2. Neither the law nor the contract makes the failure of the company to perform their contract at the time stated fatal to their right. The decision of this question was left to the commissioners; and it does not appear from the complaint that the commissioners did not act wisely in extending the time. 3. Nor has the plaintiff any ground for complaint that the bonds were not delivered to the state treasurer. That was an obligation, to a violation of which only a party to the contract could object. The plaintiff only complains of violation of the injunction, in that they were not delivered to the state treasurer in ten days; but if he makes out the invalidity of the contract, the court has no foundation for ordering the bonds into the hands of the contract depositary. The command to the defendants not to deliver the bonds to the company, or to any one for its use, *which the plaintiff does not claim has been violated*, covers every right which could be claimed upon the bill. 4. It appears beyond doubt, from the affidavits and other proofs, that the board did not have control of the bonds, and that they could not deposit them with the state treasurer when the injunction issued. It does not avail the plaintiff that the commissioners sent the bonds to Chicago in anticipation of this suit. That was no contempt of court.

DIXON, C. J. The statute (sec. 10, ch. 264, Laws of 1860; 2 Tay. Stats., 1635, § 11), among others, gives an appeal to this court from "a final order affecting a substantial right, made in special proceedings," and "when an order grants, refuses, continues or modifies a provisional remedy."

In *Ernst v. The Steamer Brooklyn*, 24 Wis., 616, the writer, after having quoted the definitions of the statute (§§ 2, 3, ch. 122, R. S.; 2 Tay. Stats., 1417, §§ 2, 3), that "an action is an

ordinary proceeding in a court of justice, by which a party prosecutes another party for the enforcement or protection of a right, the redress or prevention of a wrong, or the prevention of a public offense," and that "every other remedy is a special proceeding," proceeded to remark as follows: "It may not be easy in all cases to determine what is a special proceeding. But many proceedings will be readily recognized as such; as proceedings to attach for contempt, to obtain discovery of books, etc.; proceedings supplementary to an execution, and many others. And others, again, will be as readily recognized not to be special; and among these we think all the necessary and ordinary steps or proceedings taken in an action to conduct it to a final hearing and judgment." It is thus seen that I was at that time, and with me also my associates, of opinion that the proceeding to punish as for a contempt was a special proceeding. The same opinion was also expressed respecting the remedy given by statute to obtain discovery of books and papers.

But in the subsequent case of *Noonan v. Orton*, 28 Wis., 386, where the appeal was from an order requiring the discovery of certain papers and documents, Mr. Justice LYON was of opinion, and the court is reported as so holding, that it was not an order made in a special proceeding, but an order granting a *provisional* remedy, and so was appealable on that ground.

It may not be very material upon which ground appealability is held in such cases; but I am still of opinion that the remedy for a discovery is properly called a special proceeding, and so defined by the statute. I am also of the same opinion with regard to the proceeding to attach for contempt. Mr. Justice LYON seems to consider that there can be no special proceeding which grows out of, or is connected with, a pending action. It appears otherwise to me. The statute itself seems to solve the question, when it declares an action to be an "ordinary" proceeding in a court of justice; and when, therefore, Mr. Justice LYON said of the remedy to obtain a discovery, that it was one

"outside of and beyond those ordinary proceedings in an action," I think he showed that it was a special proceeding, according to the statutory definition. It was not an "ordinary," but an "extraordinary" proceeding in a court of justice, for the enforcement or protection of a right, or the redress of a wrong, and so passed into a special proceeding, as named by the legislature, and classified in the statute.

Provisional remedies, as known under the code and spoken of in our statutes, have generally been considered as quite distinct from these special proceedings. Judge Hoffman, in the preface to his Provisional Remedies, says that the code of procedure, having divided remedies in the courts of justice into *actions* and *special proceedings*, has a subdivision under the *head of actions*, termed "of provisional remedies in civil actions." Those form the subject of the seventh title of part two of the code of New York; and that title is separated into five chapters. Those chapters comprise the important subjects of AR- REST AND BAIL; CLAIM AND DELIVERY OF PERSONAL PROP- ERTY; INJUNCTIONS; ATTACHMENTS; and of PROVISIONAL REMEDIES, embracing RECEIVERS and some miscellaneous proceedings. In his work he treats the foregoing as provisional remedies. Mr. Thompson's nomenclature of provisional remedies is the very same, except the fifth, which is entitled, RE- CEIVERS AND OTHER PROVISIONAL REMEDIES, to which he adds a sixth, namely, WRIT OF NE EXEAT. Thompson on Provisional Remedies, table of contents. It is well known that the legislature of Wisconsin took the code of New York as they found it on the day of its adoption, without one word added or one left out; and consequently that the foregoing works are commentaries on our code, as much as on that of New York. And it is a coincidence not a little singular, that Mr. Thompson (p. 332) "for practice. in proceedings for contempt," refers us to Crary's Special Proceedings.

I do not care to pursue the subject further in vindication of my views that the present was a special proceeding within the

meaning of the statute. The order appealed from, being a final one affecting a substantial right in such a proceeding, I think was appealable.

Counsel for the plaintiff argued at considerable length, and very forcibly, to show that the defendants, the board of railroad commissioners of Wood county, exceeded their powers and were guilty of usurpation when they entered into the agreement of January 25, 1873, with James F. Joy, and when also they adopted the resolution of February 4, 1873, directing the bonds of the county to be deposited in the Union National Bank of Chicago in escrow, as shown by the resolution and by the receipt of W. F. Coolbaugh, president of the bank. Counsel argue that it was a breach of trust and violation of the duties imposed by law upon the railroad commissioners, not to have placed the bonds in the office of the treasurer of the state, as provided in the agreement entered into with the railroad company and in the submission to the vote of the qualified electors of the county. They argue that it was a further usurpation and wrong to cause or to suffer the bonds to be taken out of the state, so as to be beyond the jurisdiction of its courts or the reach of process in the hands of the proper executive officers. But all these things were done *before* this action was commenced, and *before* the injunction was issued, for disobedience of which this proceeding to punish as for a contempt was instituted. The defendants answer that the bonds were gone *before* any process was served upon them in the action, and that it was impossible for them to regain possession or control of the bonds so as to comply with the mandate of the injunction by depositing them with the state treasurer.

It is not a position assumed by counsel, that the defendants are in contempt for what they did prior to the service of process upon them, or that they are liable to punishment therefor, provided it be shown that the bonds were in fact beyond their reach and control at the time the injunction was served, and so remained up to the time of the hearing of the order to show

cause why they should not be punished for the alleged disobedience. It is certainly very unusual that parties should be adjudged in contempt for any act or omission occurring prior to the commencement of suit or the service of process; and yet it has sometimes been done. *The People v. Salomon*, 54 Ill., 39, is an instance of the kind. But the facts of that case were peculiar; one of which was, that the defendant had had the opportunity of showing that the misconduct complained of took place before the action was instituted, but had contemptuously refused or neglected to avail himself of it. The court evidently considered it trifling with the process of the law and the time and attention of the court, for the defendant to come in afterwards and seek to excuse himself upon a ground which he had so previously ignored. We think counsel for the plaintiff are correct in not assuming, or more properly, perhaps, in not insisting, that these defendants are punishable in this proceeding for acts done by them before the action was commenced.

The object of the argument appears to be, to show that the circuit court was wrong in its practice in discharging the order to show cause upon the *ex parte* affidavits produced by the defendants, instead of causing or permitting interrogatories to be filed by the plaintiff, and requiring specific answers to be made to them by the defendants on oath, as the statute provides may be done. It is insisted that the course pursued was unauthorized and irregular, and that in place of the *ex parte* showing made by them, the plaintiff was entitled to search the consciences of the defendants, and to explore and ascertain the facts more completely and thoroughly by means of written interrogatories propounded to the defendants, and their answers under oath in direct and categorical response thereto. The practice thus contended for would clearly have been proper on return of the order to show cause and the appearance of the defendants, as was held by this court in *Poertner v. Russel*, 33 Wis., 193.

But although such practice would have been proper, had

the circuit court seen fit to adopt it, yet the course pursued by the court was likewise regular and proper. It is the well settled judicial construction of the same statute in New York, whence our own was borrowed, that where an order to show cause is granted, the course to be pursued may conform to the general practice of the court on orders to show cause why relief should not be granted. The order, being granted on *ex parte* affidavits and proofs, may be discharged on evidence of the same kind produced by the party against whom it was obtained. "If," says the chancellor, in *Albany City Bank v. Schermerhorn*, 9 Paige, 372, 375, "the alleged misconduct is denied, the court may discharge the order to show cause; or may allow interrogatories to be filed, and refer it to a master to take the answers of the accused to such interrogatories, and to take such proof as either party may wish to offer, and report the same to the court." And in *Watson v. Fitzsimmons*, 5 Duer, 629, one of the points expressly decided was, that, when the incipient proceeding to punish a party as for a contempt is an order to show cause "why he should not be punished for the alleged misconduct," and the misconduct is denied, it is not essential to the validity of any final order that may be made, that interrogatories should be filed. Taking the statute with the construction it had thus received, we must hold that the course here pursued was not irregular; and, the affidavits produced by the defendants establishing *prima facie* that they were not guilty of the contempt charged, we must also affirm the order of the court discharging the order to show cause.

*By the Court.*— Order affirmed.